[No. 30742. Department Two. August 5, 1949.]

*In the Matter of the Guardianship of the Estate of* ANNA MARIE HEUSCHELE, *an Alleged Incompetent Person.*
ANNA MARIE HEUSCHELE, *Appellant,* v. THEKLA PHELPS *et al.,* *Respondents.*[1]

*Chavelle & Chavelle,* for appellant.
*Henry Clay Agnew,* for respondents.

ROBINSON, J.—In December, 1947, four of the daughters and one of the sons of the appellant, Anna Marie Heuschele, filed a petition in the superior court for King county, alleging that she had reached the age of seventy-eight and had property and estate in King county of the value of more than ten thousand dollars, and, by reason of failing health and mind, had become incompetent to carry on business transactions and to handle her own affairs. They further alleged that her property was in need of proper supervision and protection, and prayed that the Seattle-First National Bank, or some other competent trust company, be appointed as guardian of her estate.

In her answer to the petition, Mrs. Heuschele denied that she was incompetent and unable to handle her own affairs. She further pleaded, as an affirmative defense, that, in 1944, Thekla Phelps and Anna M. James, two of the petitioners

[1]Reported in 208 P. (2d) 1167.

herein, petitioned for the appointment of a guardian for her person and estate, and that, on September 1, 1944, Thekla Phelps was so appointed, and thereupon moved appellant from her own home in which she had lived for many years, and placed her in a commercial home for old people; and that, in August, 1946, Fred Heuschele, one of her sons, petitioned for removal of Mrs. Phelps as guardian, and, in October, 1946, his petition was granted and the guardianship proceedings dismissed. Thereupon, Mrs. Heuschele returned to her own home at 6727 Corson avenue, Seattle, and ever since her son, Fred Heuschele, and his wife have lived there with her. She further pleaded that she was mentally and physically able to conduct her own affairs; and prayed that the petition be dismissed, with prejudice, and that she be allowed her costs, including a sufficient amount of money for attorney's fees, and such other relief as might appear just and equitable.

The evidence in this cause shows that Fred Heuschele, one of appellant's sons, succeeded in having his sister, Mrs. Phelps, removed as appellant's guardian, and that guardianship closed in October, 1946, and that, thereupon, the appellant returned to her own home in Georgetown, and, in March, 1947, Fred, his wife, and five-year-old daughter moved in with Mrs. Heuschele with the understanding that, in lieu of paying rent, they would furnish the food for the household, pay the light, water, and telephone bills, and Mrs. Fred Heuschele would do the housework, cooking, and cleaning, and the appellant would pay the taxes and fire insurance premiums, and for any repairs or alterations of the premises which might be required. The Fred Heuscheles have lived with the appellant under that arrangement ever since.

There is a great deal of evidence to the effect that Fred Heuschele and his wife have repeatedly refused to permit appellant's daughters and members of their families to visit the appellant at her home, and there is ample evidence that, at one time, actual physical violence, amounting to an assault, was used by Fred Heuschele to keep two of

his sisters, Mrs. Phelps and Mrs. James, from seeing their mother or talking with her. In another instance, he called her attorney, Mr. Chavelle, and asked him to send out police to assist him in removing his sisters from the premises. He justified, or attempted to justify, his conduct on the ground that the old lady needed rest and quiet and the visits of her daughters and their children "upset" her. It is but fair to note that the appellant herself so testified. By "upset," they appear to have meant "excited," but Fred Heuschele was careful to explain that he did not mean "mentally disturbed."

The trial judge rightly commented that, for the past few years, Fred Heuschele has completely dominated the appellant. Shortly after he succeeded in having her released from the guardianship, he took her to Mr. Chavelle's office and had her execute a will. No evidence as to the provisions of the will was introduced. However, at about the same time, Fred Heuschele got personal control of appellant's property, or the bulk of it, in various ways; first, he procured from his mother, and recorded, a general power of attorney. There is no evidence that he has in any way exercised the power so granted. He got actual control of the bulk of her property in other ways.

While under the previous guardianship, Mrs. Heuschele sold a garage property for nine thousand dollars. She also sold a small 15th avenue house and lot, with respect to which installment payments of thirty dollars a month are still being received. At the time of the trial, the balance to become due under the sale contract was $792. A considerable portion of the money received for the garage property was put into a savings account in a Georgetown bank, and that account has been increased from month to month by the thirty-dollar-a-month installments above mentioned. This is a joint account of the appellant and Fred Heuschele, and now amounts to $6,025.

The appellant testified that, for more than three years, she had kept about three thousand dollars in currency in a strong box concealed in the cellar or basement of her

home. Other evidence conclusively shows that the amount originally so deposited was in fact in excess of five thousand dollars. It was the part of the money she had received from the sale of the garage property. She testified that she kept the three thousand dollars in currency hidden in the cellar because she needed some money around home from time to time. She further testified:

"Q. Weren't you afraid the house might burn, have a fire and burn that up? A. It is a pretty strong place where I kept it. Q. What did you do, dig a hole in the wall or something? THE COURT: I don't want to find out where it is. THE WITNESS: It is in a strong box in the basement. Q. Does Fred know where that money is? A. What? Q. Does Fred know where it is? A. Yes, in case something should happen with me. Q. Then what would become of it? What would become of it if something happened with you? A. Well, then — Q. Whose money would it be? A. My will would show. Q. Your will? A. Yes. Q. Have you ever — is this money in a strongbox, you say? A. Yes. Q. Fred knows where it is? A. Oh yes, he knows."

The appellant makes four assignments of error, but relies principally upon the following:

"That there was a complete failure of proof to support the findings of fact and conclusions of law."

Throughout the appellant's brief it is stressed that each of three well-qualified psychiatrists testified that, as a result of thorough examination, he had reached the conclusion that appellant was mentally competent, and no expert witnesses were called by the petitioners to rebut that testimony. But there is another aspect to this case. The petitioners sought the appointment of a guardian of the appellant's property and estate, alleging (1) that she had become incompetent to carry on business transactions and handle her own affairs, and also (2) that her property in King county, of a value of more than ten thousand dollars, "is in need of proper supervision and protection." While the trial judge did not make a literal finding that the appellant was mentally incompetent, he did come to the conclusion, after hearing a great deal of testimony and

argument, that the appellant is unable, because of age and infirmity, to carry on her ordinary business affairs independent of the influence of other persons, and quite clearly indicated, by comments made during the course of the trial, that he thought her property and estate was in need of supervision and protection. We quote the findings of fact and conclusions of law entered by the trial judge on July 18, 1948:

"FINDINGS OF FACT

"I. That Anna Marie Heuschele, because of age and infirmity, is unable to carry on her ordinary business affairs independent of the influence of other persons.

"II. That Fred Heuschele is now and has for considerable time past completely handled the business affairs of Anna Marie Heuschele and has in court rendered a proper accounting to the date of the trial of all his transactions in this regard. That said Fred Heuschele has the confidence of Anna Marie Heuschele and is a proper person to be appointed guardian of her estate and is in fact acting as such now and has been for a considerable period. That an exception should be allowed.

"From the foregoing findings the court concludes as a matter of law:

"I. That Fred Heuschele should be appointed guardian of Anna Marie Heuschele's estate. That an exception should be allowed."

Pursuant thereto, the court immediately entered the order from which this appeal is taken, appointing Fred Heuschele guardian of the estate of Anna Marie Heuschele and fixing his bond at five thousand dollars. It was admitted, during the argument in this court, that he has filed his bond and qualified as guardian.

We do not consider it necessary to include herein a complete digest of the evidence introduced at the trial. However, the appellant's assignments of error are such that it seems necessary to add something to what we have hitherto said of the evidence in the case.

The appellant was called as a witness quite early in the trial, and the first thing that was established by her testimony was that she had believed that the purpose of this action was to have her declared to be insane. Later in her

testimony, she showed that she knew what property she had. She testified that she had $6,025 in a savings account in the First National Bank of Georgetown, and that this was a joint account with her son Fred, from which either she or Fred could draw money. She also testified at length concerning the three thousand dollars in currency which she kept in a strong box in the basement of her home. She further testified that her home property was worth four or five thousand dollars.

Shortly before the close of the trial, Fred Heuschele brought into court $3,100 in currency, which he had withdrawn from the strong box in the basement of appellant's home. After some discussion between the court and counsel, this money was, by the trial judge, ordered deposited in the registry of the court, subject to the further order of the court. At the same time, Fred Heuschele explained that he had previously, during the little more than a year he had lived in his mother's home, withdrawn $2,050 in currency from the strong box to pay his mother's bills, and furnished a list of such expenditures, as follows: Attorneys' fees, $380; insurance and taxes, $252.13; doctor's services, $612.04; maintenance of house and premises, $719.25; miscellaneous, $86.58; making a total of $2,050. Since he brought $3,100 into court, it is apparent that the amount of currency kept in the basement was originally in excess of $5,000.

The trial judge several times expressed his concern over the foolhardiness of keeping such a large sum of currency in the basement. In rendering his oral decision, in referring to the testimony given by the three psychiatrists, to the effect that appellant was not mentally incompetent, he said that he had arrived at that conclusion from his own observations of her while she was on the witness stand, and he also said, in speaking of her keeping the currency in the basement:

"Of course, that shows the influence that Fred must have over her. He must have a powerful influence over her; there is no question in my mind about that. And, also, the further fact that she gave him joint control over practically

all the money in the bank to draw it out any time. What will become of the property, the real estate? I don't know. That probably was disposed of in the will. That property is worth, probably, as I understand it, about five thousand dollars. *The old lady needs help. She needs assistance. She is not able to handle these matters herself.* She has to consult with someone, and in this case she consulted with her son Fred; I'm convinced of that. And she knows about this money being paid into the bank, $30.00 a month.

"I think that, under all the circumstances, that Fred, whom she trusts and relies upon and lives there with her and on whom she looks to for advice in regard to her financial matters—I think that Fred should be appointed her guardian. She can't object to that, in my opinion." (Italics ours.)

The trial judge further said, during a colloquy with appellant's counsel:

"THE COURT: *I think, under the circumstances of this case, that she has—she doesn't exercise an independent judgment, free from the influence of her—*Fred, and perhaps Fred's wife. She consults with him in everything she does, and she doesn't exercise her own independent judgment. She has implicit confidence in Fred and she demonstrated that by permitting him access to this money in the strongbox in the basement and to permit—in her permitting him to share with her in the deposit in the bank in the joint account. She has—We are all subject to dissolution. She is rather feeble. I believe that is the best solution of this whole problem. I have given it very careful thought today and at noon and as the case was proceeding. I think it is a happy solution of the matter. *Then he can spend whatever money is required to be spent under the order of court.*" (Italics ours.)

The trial judge further said:

"THE COURT: *I don't think she is competent to exercise her own independent judgment, free from the influence of others.* I think she is dominated by Fred in the exercise of any judgment that requires the expenditures of money, and Fred is the one that dominates her." (Italics ours.)

And referring to his intention to appoint Fred Heuschele as guardian, the trial judge said:

"THE COURT: I think, in summing this up, the last words before I leave the bench, I think that he really is, in fact,—

has assumed the position of guardian for her all through here. He has assumed it without having it signed by the court. He is acting in that capacity as a guardian of the mother, a very creditable thing to do, and she consults him because she has confidence in him and they live together under the same roof and he is right at home and at ease. *He is really her guardian, in fact, if not in name. I don't see why he shouldn't be put in a position where her funds will be concerned under order of the court, and not be permitted to spend the money and take it and do as he sees fit.*

"Now, she can do in her will—she can leave the property to whomever she desires. That is up to her. That is her own privilege, to do that; but *I think that she should be protected by a guardian who is acting under orders of the court.*" (Italics ours.)

It is clearly evident that the trial judge concluded that the evidence established the truth of the petitioners' allegation that the appellant's property was "in need of proper supervision and protection." We are of that opinion also. Having come to that conclusion, the trial judge proceeded to effectively provide that protection by ordering a portion of the property to be deposited in the registry of the court and placing the remainder of it under the control of a bonded guardian directly responsible to the court.

The order from which this appeal is taken will, therefore, stand affirmed. It is so ordered.

JEFFERS, C. J., SCHWELLENBACH, and GRADY, JJ., concur.

SIMPSON, J., concurs in the result.